Mr. Chen, Judge Slovener, Judge Ambrose, Judge Rastani, good morning. My name is Rex Chen. I'm from Catholic Charities of Newark and I'm representing Nazmi Rranci, the petitioner in this case. With your permission, I would like to reserve three minutes for rebuttal. In this case, you argue that there are two examples of ineffective assistance of counsel. The first is in effect intimidating or bullying Mr. Rranci to accept a voluntary departure. And the second is not making supposedly the state created danger argument. For either one, isn't there a predicate that you have to go, aren't there steps you have to go through that the BIA requires and we have agreed are correct and that's under Lozada. Was there any type of, were any of those three steps that Lozada requires done here? Yes. I question whether the Lozada standard is the appropriate standard but assuming that it is, I believe that the record shows that we did satisfy the three requirements. I can go through them. The first requirement is to make sure that the person representing the client really promised to represent him. For example, what if he didn't submit a brief but he was never hired to submit the brief. So there's a request to put a detailed explanation of what the person was hired to do. That we satisfied and the lawyer's appearance in court for the client makes clear he really was hired to represent my client. And the second or third? The second is actually to raise the allegations with the former counsel so he has an opportunity to respond and that if he says anything, we would share that with the BIA and the immigration judge. We did that. We had very limited time so we decided instead of faxing him something, we'd actually call him and tell him, these were the allegations. We think that these are problems. Please let us know. The only complaint by oil counsel is that in raising the allegations, we never used the magic phrase of ineffective assistance. When we told him, you intimidated the client improperly. That's all we said. But he gave us his response and we included that in our motion to the immigration judge. So it's clear we satisfied that. On both issues? On both issues. Why he never raised the state created danger doctrine, he said, good luck with it. I've never heard of it. That was his explanation for not raising it. And the other one was intimidation. He said, that never happened. That was his view. And I shared that with the immigration judge. And then the third lasagna step is? Third step is either to file a complaint or to have a valid explanation of why one was not filed. And we offered our explanation that we had a very limited amount of time before the strict 90-day deadline for motions to reopen. And that our client really didn't understand English very well, very hard to communicate with him. We proposed this. We included that explanation, not just with this court, but with the immigration judge and with the BIA. That was part of our motion. Does lasagna apply to a cat claim? The BIA takes a position that lasagna applies to all types of claims where you need to reopen a case. Has any appellate court said lasagna applies when you're dealing with a cat claim? I haven't looked at that specifically, but I have seen a number of cases that regularly apply the lasagna standard and accept it, that the BIA has applied it. That is one of the arguments that we have. It's not clear when lasagna was decided back in 1988 whether the case law had developed about whether appointed counsel may be necessary in immigration cases on a case-by-case basis. And I raised with the immigration judge and the BIA whether they need to revisit lasagna based on developments in appointed counsel in civil cases. When you can file a complaint, but your explanation is there was no time, doesn't the BIA get to decide whether that's a sufficient explanation? And then how do we review that? Judge Rastani, I do believe that you are correct that the BIA gets to decide whether there was enough time. But there's a problem in this case. The BIA never even addressed the issue. They just ignored our excuse. They offered no analysis. The same for the immigration judge. They just ignored. They acted as if we offered no excuse. So there's nothing for us to review. The review may be limited before this Court, but when they have no analysis, it's a problem. And I think this Court has seen this in BIA decisions before. No analysis means it's a problem and it must be remanded so they can address these issues. If the Seton Hall people are correct, and we're going to get to that as Ms. Heer, but if they're correct about the U.N. Convention, et cetera, would it have been ineffective assistance of counsel not to have raised it before the BIA? Yes, Judge Sloviter. We believe it would have been an error because the— Well, I mean, it has to be ineffective assistance. Yes, that would have been ineffective assistance of counsel because what's important to understand— Was it in effect at the time this was going on, before the IJ and the BIA? And I will draw the distinction. Okay. The official ratification by Congress of that convention took place after the— It was December 30, 2005. In December of 2005. However, Congress was not creating a brand-new doctrine that never existed before. In fact, as the Court is aware, the state-created danger doctrine has existed for many years. Congress simply reiterated the regular application of this doctrine in a wide range of cases to protect witnesses to crimes. And in that case, witnesses to crimes committed by transnational organizations. So it is correct that Congress—there's no way you could have cited Congress's ratification in December 2005, but Congress is not creating anything new. Wait, doesn't that cut against your argument that Camara doesn't find—doesn't it have to be something new in order to get out of Camara? To the extent—there are several reasons why— I'm saying that right. Is that the right way to pronounce that? I'm actually not certain. I've always pronounced it that way. I believe there are several ways to look at the Camara case. One is that, just from principles of what is dictum in a case, it's clear that it's broad dictum. It's not dictum. All the courts—everybody in this circuit has followed it, and the First Circuit has now accepted it and followed it. Camara is a blanket statement. The state-created danger doctrine does not apply in immigration proceedings. And that's because the concept behind Camara has to do with the distinction between the executive and the—well, whatever is the statement—and the judiciary. And that can't apply in immigration. And that's what I wanted to ask you about. Here, the persecution would be not persecution by anybody in this country. They're not creating the danger. It's what would happen in Albania. We have several cases today. One is Albania. One is Sierra Leone. Actually, I understand— This is Albania. My understanding is a slight bit different. My understanding is that you were alleging that the ranchie's name was given to the person who was previously removed, and that created the danger. The traditional—Your Honors, the traditional way the state-created danger doctrine is analyzed in this type of situation is that the final step is that the government, the U.S. government, by force, will actually hand over the individual overseas. And that is the last step in the state action. It's true the state is not going to plunge the knife in his back in Albania. However, that is a state action after creating a special relationship— So the state action here is the actual removal of ranchie. That is the last step in the state's action, yes. I mean, the state began the action by convincing him that they would protect him if he would just cooperate by testifying against clear, organized crime members in Albania. What's remarkable about this case, and it's different from Mr. Kamara's case, is that the facts are not disputed. And there is clear evidence that this is the classic type of facts, that this type of doctrine is meant to protect crime witnesses, to organize real organized criminals who have really attacked people and threatened him through people they know in Albania. He's really been convicted. Let's get back to Judge Amber's question. Did anybody in the U.S. government tell the threatener that ranchie had named him? It's not clear from the record. However, our basis in the record is that he has received direct threats. Well, he by name received threats in Albania saying, we know that you testified against us and promised to help. What happened is that the organized criminals pled guilty. So he never, ranchie never had to testify. He never physically had to testify, but as is in the record, they used his cooperation to assist in obtaining a guilty plea. So, you know, let's put the combination of the facts together. We don't have the fact that the prosecutors directly told the criminal, but we have the fact that he helped. They interrogated him for two weeks to convince him to cooperate. They used him in the process and that by name, the criminals have said we are going to kill him when he comes back. The only other option would be a faint hope that they are somehow mistaken. And yet he's still in danger. Couldn't he be removed to another country? That would not be a problem if the criminals would not threaten him there. How do we know that the criminals, I mean, this is one, Albania is one of the, well, it's near one of the former Soviet countries, but there are a lot of them in that area of the world. Has there been any inquiry as to whether he could be removed to another country? My understanding is the government has made no effort. They are really focused on one point, that they can remove him at their choice to Albania. And they really have no other thoughts about it. That's their decision. Could I go back to the problem with Camara? I think there is a problem because unless it's new, he's not going to, if it's new, it's hard to say he's ineffective. On the other hand, it's got to be new to get around Camara. What are we calling this treaty and protocols, TOC? That's, yes. That's a self-executing treaty, according to the signing statement by the President. I don't know, I can't discuss, I can't figure out right now how much effect signing statements have. But assuming it's a self-executing treaty, I suppose it's something that could actually be seen as amending the immigration laws, if that's what it does. But does it? I mean, what statements are in it that one might, it would cause one to conclude that a treaty has now changed our domestic law? Well, that's what we're going to really discuss. I'll reserve the bulk of that. You can ask him anything you want. Thank you. I will give a brief explanation, and I'm sure it will be elaborated a bit later. There are certain articles in the TOC, especially Article 24. Along with that, a self-executing treaty does not necessarily mean that it explicitly amends immigration statutes. Sometimes treaties provide defenses in immigration law. And it's not that we are ripping up the statute to say now that you can't go to immigration court anymore, the whole process falls apart. But simply that there are certain protections. What's something added on? Additional defense, additional protection, just something to stop a process that's happening. And you think this is in Article 24? Or do you think it's in Article 16? I think the strongest may be in Article 24. I'll defer to Counselor McGee. All right. Thanks. Marencio didn't argue that he will be tortured, did he? That was one of his initial arguments. And through an unclear process, he withdrew that after being, in our view, intimidated by his counsel. It's something that, if it needs to be developed, would need further factual development. Well, if he waived that argument, then why should we send it back for another shot? It goes back to Judge Ambrose's view of two different bases for ineffective assistance. If the intimidation outside the courtroom is the ground for ineffective assistance, then he needs to be put back in the same place. And therefore, there's no waiver of his asylum and CAT claim. He only waived that as part of, in our view, intimidation to take voluntary departure. On the other hand, if we're seeking the state-created danger doctrine, there really is no need to remand based on CAT as we seek relief under the basic due process principles nicknamed state-created danger doctrine. Well, let me ask you about voluntary departure. If he takes voluntary departure, he can go any place he wants if they'll accept it. Has he tried? He has not tried. I do not see any way that a country would take him. Well, why? Because normally, voluntary departure, people seek to go to countries where they have passports. France takes everybody. He may have ways of slipping through the border, but he doesn't have a clear way of getting the airplane ticket to fly over there. I don't understand. No, I was serious. I wasn't being flippant about that. French and maybe some of the former French colonies accept everybody. Is he supposed to be dangerous? Is there any indication that Mr. Ranchi was a criminal? Oh, there's no indication at all. He did talk to the organized crime folks nearly to be smuggled into the U.S. before turning and testifying, offering to testify against them. But there's nothing in the record, and certainly a remand would probably clarify this even further, nothing in the record says he's committed any crimes or he's dangerous. Well, that's why I ask. I don't know why one can assume, going back to Judge Amber's question, that another country wouldn't take him. If we take a step back and look at the due process clause and why the state-created danger doctrine exists, it's to prevent certain actions by the U.S. government that would shock the conscience, which is conceited and sincere. But we're asking, okay, let's assume all that's true, and you're completely right, but if he accepted voluntary departure and he didn't attempt to find if he could depart voluntarily somewhere, has he really done his due diligence? The answer is that if we had not raised ineffective assistance of counsel, we might have a problem. But because we're raising ineffective assistance, this is the argument that would have happened before he accepted voluntary departure. The fact of what happened when the lawyer failed to raise the state-created danger doctrine is irrelevant to the case if we can succeed in reopening it. Isn't your best argument that we should remand in order to allow development as to whether, indeed, his agreement to depart voluntarily was indeed voluntary? As you raised, there are two issues for potential. I believe there should be a remand on both issues. In other words, let's assume for the moment you comply with Lozada. But isn't the only thing we could do for you is to remand as to whether the agreement to depart voluntarily was indeed voluntary? We respectfully disagree. We believe another option is to explain that for this limited class of people where it is undisputed that the government is acting in a shocking manner to deport a crime witness to organized criminals, that in that limited category… But you just said yourself that you need developing facts to be developed. We don't know, and I had thought based on something that was said in the Seton Hall brief, that there was a statement by the government to the person who was deported. I think his name was Mr. Muho, I believe. Muho. That the person who had given them information about him, Muho, was Mr. Ramsey. And you're saying that's not necessarily the case that you know of. I do not believe it's a strict requirement to show because he cooperated… Okay, so your argument that state-created danger is us removing somebody, well, that would mean there would be state-created danger in every case. See, state-created danger is, if you look at the F case or whatever it was from 1996, the police officers at 1 a.m. in the morning, on a very cold morning, have a husband and wife walking down the road. They say that they will take one of them home and they leave the other one there and she freezes to death. They created the danger by not having them together and therefore they're liable for the consequences. And by not walking her home. By not getting her home. And therefore they're liable, they created the danger and they're liable for it. Where is the United States creating the danger here? I believe there are two things that support our position. The first is that there is no dispute that the government acted in a shocking manner. That's not even been disputed below. The second is that… What was the shock? What was it? That in the course of prosecuting the gentleman who pled guilty, that it was clear that Mr. Ronci, my client, was one of the people who cooperated. That it was clear. Why is that shocking? I mean it happens all the time. In most of these immigration cases we see that. Somebody says these are the people, these are the skinheads or whatever you call them. What would be shocking is if they went out of their way to let the bad guys know that this was the guy that did them in. And then turn him over in a situation where the bad guys would get him. If they went out of their way to do that, that would be shocking. This is very ordinary. This happens all the time. It's unusual that they would ask my client for over two weeks to try to convince him to cooperate with the authorities. That's the way they work. Why is that shocking? And then my client tells the police, the government, that if I cooperate I will be in danger. And they tell him, don't worry, you will not be deported. And then he gets specific threats against his life by the criminal who then is deported to Albania. Is it clear on this record that he was told he would not be deported? That is in the record. That's in his statement and his affidavit and it's uncontested. So you're claiming there was an agreement between the government and your client that he would not be deported in exchange for his testimony. Not an explicit agreement that he was told that you would not be deported. Now, is that an agreement or is that just a promise? But what he said in his affidavit on A95, when I was held in Texas by United States officers, the officers and attorneys promised that if I cooperated I would be protected. The reason I cooperated with the investigation was only because they promised I would not be deported to Albania. That's correct. And on page 37 of the appendix is another statement by my client, the same person who wrote that first one you read. And he said that in convincing him to cooperate, they said the removal proceeding would be waived because of his cooperation. And was there a finding made on that anywhere that in fact that was or was not actually promised? The procedural stance of the case is that the IJ and the BIA say even assuming all of that is true, you still can't get any relief. This is one of the strongest factual bases to take one of these claims because they've never contested. They say no matter what the facts are, no matter how horrible it happened. So there was no finding? No explicit finding. It was assumed that all of these allegations are correct because they felt no matter what scenario happened, you still can't get relief. Has any court said that circumstances like that or has either said or rejected that circumstances like that do or do not create an enforceable contract with the government? I'm not familiar with that. We'll ask the government that. Okay. I'm not familiar with this enforceable contract theory. Well, a contract is enforceable. Okay. Thanks, Mr. Chen. Thank you. We'll see you. Mr. Asmey, we thank you for arranging your schedule so that you can come and speak to us. Thank you for inviting me. Bahar Asmey, Seton Hall Law School Center for Social Justice on behalf of Amici Asian American Legal Defense Fund et al. In my limited time, I would like to make two points. First, the United States ratification of the Convention Against Transnational Organized Crime supports the judicial invocation of the state-created danger doctrine in the limited category of cases such as Mr. Ranci. And second, this court's decision in Camara is not a categorical obstacle to granting Mr. Ranci relief. Now, show us the language. Show us the language. Sure. Our argument primarily rests on Article 24, Section 1 of the Convention. Hold on. We have, at least I have. I have 24. I'm sure we have. Hold it down. I can read it into the record? It's okay. Yeah. Hold on. Article 24. Go ahead. The protection of witnesses. Protection of witnesses. Okay. And it recognizes that all states have an obligation to provide witnesses in these criminal prosecutions covered by the treaty effective protection from harmful retaliation. Now, when the United States ratified the treaty in 2005, there was an express understanding that U.S. law was already sufficient to meet our obligations under the treaty and that no new legislation was necessary to meet our obligations under the treaty and, in particular, this provision. Well, excuse me. Can anybody finish that up? Okay. And so Amiki's position is that if we look at the state of the law in 2005, really the only law that could be said to have met the obligation under this provision is the state-created danger doctrine. They track each other perfectly. That is, the state-created danger doctrine and this provision of the treaty both provide the government's reasonable discretion to take appropriate measures to protect witnesses. However, that discretion is limited or includes as an absolute baseline the obligation not to actually take affirmative steps to put a cooperating witness in more danger than they otherwise would have been, but for the government conduct. That's a sort of elementary limitation on what the government can do that we think is clearly suggested by both this provision and the United States' recognition that the laws already comply with that provision. Now, Article 24 talks about witnesses who give testimony concerning offenses. Doesn't that mean testimony in court? We don't believe so, Your Honor. I think the entire treaty is concerned with preventing retaliation, so if testimony is given to a U.S. attorney in order to secure a cooperation which subjects the person to harm, that's tantamount to testimony in open court, and I don't think there's a dispute that Ronci would have testified in open court. Now, the second numbered paragraph of Article 24 specifies the measures envisaged by Article 1, and it talks about relocating them and permitting evidentiary rules. It doesn't say shall not deport them. That's right, Your Honor, and again, this provision includes some discretion to government officials to choose the method in which they would protect or even choose not to protect, but again, as an absolute baseline, it includes the obligation not to put a witness in a worse situation than they otherwise would have been. What if the government then, and we've seen it done in other cases, where the government has affirmatively attempted to find a country that would take this individual? That would certainly comply because the government would take measures, probably appropriate measures if they find another place, in order to protect this person from potential retaliation or intimidation. Your Honor, Judge Amber, I think that would vitiate the harm created by the government in this case, and I think would provide him protection under the treaty, assuming, and I don't want to contradict Petitioner's Counsel, assuming there's no evidence that these gangsters could reach him in another country, say Canada or Yugoslavia. Or anywhere. Yeah, right. Can you help me out of this circle? I've got this circle problem. We have Camara that says state-created doctrine doesn't apply in immigration matters, and then you say we have this new treaty, but everybody agrees that the state-created doctrine is our law that makes it easy to apply this or implements it. So if Camara says that's the thing that doesn't apply, and this merely refers back to the thing that doesn't apply, how do you win? Your Honor, I think we have to read Camara limited to the particular factual circumstances presented there, and if I can address that in a little bit more detail. In Camara, my understanding is that Petitioner alleged that the deportation in and of itself, without anything more, constituted government misconduct, which was clearly a misapplication of the doctrine because the government didn't create the underlying conditions in Sierra Leone that subjected him to danger. Moreover, and perhaps more fundamentally, Mr. Camara was therefore really trying to rewrite the entirety of immigration law because therefore half of deportable aliens who could demonstrate any dangerous country conditions would have a right to invoke the state-created danger doctrine. Here, Mr. Ronci alleges that the government induced his cooperation against a very serious criminal. I think there is some dispute which can be developed on the record about how that criminal found out he testified and therefore very clearly threatened to kill him upon return. And then the government, having taken those measures and created itself the danger in Albania, is taking the last step, as Mr. Chen said, to finalize the danger and deport him. So if we follow what you're telling us, could we limit the holding to instances in which the government induced information or cooperation from an illegal alien that subjected him to danger and it wouldn't apply? I envision the possibility of your attack or Mr. Chen's attack on the state-created danger doctrine to apply to all the cases where people are telling us when I go back they're going to put me in jail because I escaped, I'm a political prisoner or I escaped, and the conditions in the jails are terrible. We have one case we've just in fact, as a matter of fact, you may not know that. What's the name of that case? Pierce? No. Well, we've just in fact an immigration case, you can find out easily, which will be heard in a second, we just decided in February, about somebody going back to a jail in Haiti where he has special physical problems and the question is can they take care of that in Haiti? Now you're saying that wouldn't apply. I would agree with the court's decision in Camara that there is no substantive due process right not to be deported. The right stems from protection against government misconduct, creating the circumstances of danger and then finalizing it. And I think what we see is this doctrine clearly applies domestically, there's even case law in the circuit, the case Cherry v. City of Philadelphia, which is 216 Fed Appendix 205 from 2007. We don't acknowledge. I understand, but I do think the broader principle is there's no doubt that the state creation of danger doctrine would apply domestically. That is, if a government agent took testimony, coerced testimony from a mob informant and then told the mob informant of that testimony and then dropped that domestic witness off in the mobster's backyard in Brooklyn, the court would recognize, and there are other cases that have recognized, that that would violate the state created danger doctrine. I think what this treaty simply confirms. And that would be a state created danger. That's right, it would be a state created danger. And I think what this treaty merely confirms is just that the political branches recognize that that protection which would exist for someone sent to the mobster's backyard in Brooklyn applies just as equally to someone who's returned to the gangster's backyard in Albania where he faces certain death. That just by sort of taking our obligations global, so to speak, it recognizes that this doctrine applies without interfering, because it applies to such a narrow category of persons, witnesses in transnational crime. And because of the very limited legal nature of the claim, would not threaten immigration law remotely. And one last point, if I may. Go ahead. The trigger, another limitation on this doctrine, and why it's not very much an intrusion on an executive prerogative, is that the trigger for the application of the state created danger doctrine is always entirely in the executive's hands, unlike in Camara. That is, Mr. Camara was clearly removable or deportable at the border before the United States decided to take him in, yet they took additional affirmative steps that they didn't have to take. They could have deported him at that time, but chose to use him as a witness. There is some question about... You're right, Mr. Ranci. Sorry, Mr. Ranci, that's right. And so at any point, they can attempt to vitiate the danger by arranging for him to be removed to some other country where he would be safe. For example, we're not using his testimony, for example, although we've crossed that bridge, we're not deporting him. Does he have an obligation, going back to Judge... Did you use due diligence? Does he have an obligation to use due diligence to help find a country that will accept him? I'm afraid I'm going to have to defer to Mr. Chen on that question of immigration practicing. What I'm saying, under... Oh, under the State Created Danger Doctrine? No, under the top, under the convention. I don't think the convention speaks to that. I think that if he's given... I think it's the government's obligation now in light of the State Created Danger Doctrine and a good reading of the convention... Can I really make an argument that even with the application of the U.N. Convention, and particularly Article 24 under Addicts 1, that by allowing him the opportunity to take voluntary departure, those are appropriate measures that might protect him? My understanding is that the voluntary departure in this case would merely delay his transfer to Albania and therefore delay the very serious risk of his death, not completely vitiate it. But if nobody's checked it out, how can we say that today? Well, perhaps that's something that can be developed on the record below, but I would tend to assume that someone in the position of Mr. Ranci doesn't have many other places to go without a passport unless... I don't know why he can't. If he's not... I mean, I can see that when they come in as felons, you know, or aggravated offenses and all that. I can't see that. If, in fact, he has a clean record... Unless he was part of the smuggling ring. That's right. That's a criminal conspiracy. I don't think he was, and I suppose I'm going to have to defer to Mr. Chen about the particulars of this case and whether or not he could find refuge someplace else. But Judge Amber's question is really very pertinent to what you are here for. In other words, once they offer him voluntary departure to a country of his choice, have they not complied with everything the government has to do under Article 24? Only if, including in that voluntary departure, he does not have to be returned to Albania. And that perhaps needs some more factual development. But if they offer him, you're talking about the end result, and I'm asking about the beginning. Once they offer him voluntary departure to a country of his choice, has the government not complied with TUC, Article 24? I think once the government assumes responsibility, having gotten him to testify, my position would be that under the State Created Danger Doctrine, their obligation would be fairly high under the sort of... And I think it would be reasonably foreseeable that even granting him voluntary departure, he would not be able to find refuge other than in Albania. But I think that might have to be developed factually. That is, what's the foreseeability of him finding refuge in a country other than Albania specifically? Can I ask him one more question? Sure. I'm a little confused here. What is the essential thing that TUC adds that we didn't have before? Is there really anything that it adds legally? It sounds to me like you're arguing there was already an exception to Camara. He could already have succeeded. So what does TUC change? I think that's right. I don't think we have to reach an interpretation of the treaty, but I think what TUC confirms, that is, with the U.S. recognition that our laws are in compliance, it requires us to acknowledge that we would be in compliance with 24-1 and that therefore some provision of law complies with that. And that would be the state-created data doctrine for the reasons I've mentioned. And so what that does is merely confirm that the political branches believe that this doctrine might apply in an international context because naturally we're going to be dealing with migrants and therefore in an immigration context. So it gets you out of any separation of powers problem. Yes, I think it's federal law and it represents the considered judgment of the executive branch, and at least the Senate anyway, two-thirds of the Senate, that the separation of powers concerns are diminished and that the rule as it applies domestically should apply internationally. It seems to me that you don't have to reach the state-created danger doctrine at all because if you look at TUC, then you say, well, the obligation, and leave aside that, the obligation under TUC is to provide an effective protection. An effective protection is procedures for, among other things, relocating them, period. And you don't even have to get into Kamala. I think the court would be empowered to interpret the treaty in that way, particularly not as creating an affirmative right, but as a defense to government conduct such as a deportation. But I think our proposed rule, that is the state-created danger doctrine, for this extremely narrow category of persons covered by the treaty, is actually a more modest perspective because it avoids some of the concerns about judicial interpretation of treaties directly. And also, here it's a problem because if everything came from TUC, his counsel probably wasn't ineffective in not raising it. That may be right as well. I think TUC merely confirms the existence of the doctrine and it confirms that it should extend if domestically, internationally. Should we assume there's an or between A and B and 24-2? In other words, the measures envisaged, you can establish procedures or you could provide evidentiary rules so that the testimony is given in such a way, etc. I think that's right. There's an or. And I think our reading is there is discretion for the measures we could choose. I mean, domestically, the United States, a U.S. attorney doesn't have to provide witness protection. And if the government chooses to provide witness protection, depending upon the level of the crime, certainly there's a range of protections they could provide. They could give them a mustache, they could send them to Arizona with a new identity. But at an irreducible minimum, they can't make their condition worse than it otherwise would have been. And I think that's what's implied in 21-1. As far as we know, has the BIA ever dealt with, considered the effect of TUC on its practices? We have not seen any authority to that effect. That's right. Yes. And I would just alert the court to Ninth Circuit precedent that does say that state-created danger doctrine applies in the deportation context. It does. Yeah. There's a case called Morgan v. Gonzales, which relies on the case called Wang v. Reno. Is it one of these things where the government did more? Yes. Yes. It all involves cooperating. It all involves affirmative government conduct. I would agree there's no case that says there's substantive due process right to avoid being sent to harm, simply the sort of sixth element of asylum, for example. But in these limited circumstances, there is authority from the Ninth Circuit. Although here, you're directly bound by Camara. We are, although Camara, I would respectfully suggest, has to be limited to the particular concerns animating Camara, which was his attempt to completely rewrite U.S. immigration law by simply saying the act of deportation is unconstitutional and the threat to immigration statutes is not on here. But isn't what you're looking for is to find a way to get back on remand so that there could be consideration in the first instance of the U.N. Convention and whether the government has indeed taken appropriate measures that would protect this particular witness. I mean, looking at 844, it was clear that the person was a material witness, according to the government, and that he was prepared to testify if called upon. Yes, I think that is what we might be looking for with some, you know, deference to Petitioner's Council, a remand on the question of whether or not they've provided effective protection under TOC, and also we would advocate a remand to evaluate whether or not the government's deportation under the Faxon's case would violate the State Creative Union. Now, we do that by taking judicial notice of TOC because, of course, that wasn't the argument made by counsel in the BIA, in the IJ, or the BIA. We have to go beyond that, you're saying. Yeah, I think it's intervening authority, yes. Thank you very much. Thank you for coming. It's been my pleasure. Thank you. Mr. McLaughlin, am I pronouncing it right? McLaughlin, Your Honor. McLaughlin. Not the way it's done. Good morning, Your Honor. May it please the Court, my name is Andrew McLaughlin. I represent the Respondent Attorney General of the United States in this case. Are you from oil? I am, Your Honor. That's really good because, you know, sometimes we get immigration cases argued by tax people. Well, there should be fewer of those now. Yeah, I gather, but they added more people to oil? Yes, they have. Okay, great. We have, I should say. Good. Go ahead. This question here is just a fact question. Do you know if the government, as it has done in some other cases, attempted to find a place for this person to go other than Albania? No, Your Honor. It appears from this case that there has been no attempt to do that because voluntary departure was granted. The alien himself can find whatever place he wants to go. There's no reason for the government to find another place. Is it still open to him? Because sometimes we're told that, you know, you get voluntary departure within a certain number of days. If you don't elect it, you're out of luck. The short answer is no. Voluntary departure is not open to him at this time because he didn't depart within the time related. Now, if you relate that to the only argument on the table, the state-created danger argument, the fact is there isn't any state-created danger here because the government made available to him voluntary departure. So that's where state-created danger is out the door, either because Kat was available to him. He could have argued the same facts added up to a condition. It's a torture claim, as you saw in Kamara, as you saw in a lot of the unpublished cases that you've decided since Kamara. What is the procedure that one goes about in order to try to resurrect whether there can be voluntary departure? In other words, you say it's not available to him now, but is there a way to get it back? Let me add to that. I believe there is not under the statute. Well, but couldn't the court say that the agency didn't consider the effect of talk and considering the effect of talk, the case should go weekend order? No, Your Honor, it's beyond the jurisdiction of the court. Let me start by putting this back in the... Let me finish my question. Okay. That we can take judicial notice of talk because it's a treaty and that in light of talk, the BIA should consider whether to reopen voluntary departure as a way of complying with talk. If that were possible, then a motion to reopen would be appropriate and the alien could file a motion to reopen on that basis. Couldn't the court do it on sua sponte? No. That is not before the court. It is not within the jurisdiction of the court. It is not exhausted. It's not in this record. It's not available to the court to do. But we can take judicial notice of talk. I mean, it's a treaty. That's not the case that's before the court. The case that's before the court is whether or not the board abused its discretion in denying a motion to reopen. That's what seems to be forgotten a lot of times in this discussion. Well, we actually started with that. That's right. And the question is, did the board actually make a decision on the two arguments, one, the intimidation argument, and two, whether his counsel was ineffective on the state-created danger argument? That's correct. And so the question is, can we see in this record that they properly considered those things and also properly considered his claim that he complied with the third passata factor? It is clear on the record that the board considered lasada and decided that the lasada wasn't complied with. Motion to reopen denied. Case over. No abuse of discretion. It is clear on the record that the board considered the voluntary agreement by this alien with his attorney to withdraw from the forms of relief that were available to him and seek extended voluntary departure. Remember, he got a benefit from withdrawing from his claims before proceedings were completed. He got an extended period of voluntary departure so that he could find himself a place to go. He got 120 days, whereas the maximum that could have been authorized previously was 60 days if he had waited until the end of proceedings. And he might not even have gotten voluntary departure under those criteria for voluntary departure at the end of proceedings. So it was a rational, reasoned decision to give up something that is coextensive with this state-created danger theory. The provisions of CAT and the provisions for withholding are even broader than the kinds of things that this court could look at in the context of state-created danger. So he gave up that using exactly the same facts voluntarily in order to get this extended period of time. So the board specifically looked at that. The immigration judge specifically looked at that. But moreover, look at the state-created... The only argument on the table is that the alien's attorney should have made some kind of state-created danger argument that this court had never adopted, that the Supreme Court had never adopted in the immigration... I'm talking about the immigration context. And that the immigration judge and the board could not, within their jurisdiction, have granted relief under. How can it be ineffective assistance of counsel? Well, he claimed... claims that he was bullied by his counsel into accepting voluntary departure. Assuming for the moment that the Lozada requirements were met... Correct. We deem that they were met. Could you not remand for a determination as to whether his agreement to depart voluntarily was voluntary? Your Honor, the immigration judge specifically addressed that in the immigration judge's decision, which the board adopted. The immigration judge said, Look, right on the record in front of me, I asked you questions about the voluntariness of your decision. I asked you all of those questions, and you convinced me that it was voluntary. The decision was made. The board adopted that decision. It was not an abuse of discretion to do so. And the board... The IJ's decision was when? In the late summer of 2005, or when was it? The motion to reopen wasn't made until after tomorrow. It was made prior to the... It was made in November. Prior to the December departure date, but the motion to reopen was made in November of 2005. So maybe we come back to, then, the UN convention came up between the IJ decision and the BIA hearing. Is that correct?  and the appeal was filed. In fact, the appeal brief in this case was after... to the board, was after the UN convention was filed. And did the appeal that was filed to the BIA mention state-created danger? It didn't. One could argue that they're different, but one could, if you have some... maybe only slightly relaxed thinking here, that the taking appropriate measures is, in effect, deemed to be a remedy when the state does something that puts you in danger. And should that at least not be taken into consideration by the BIA before we pull the plug and have this person... It should have been argued in the appeal brief and wasn't, first of all. Secondly, let's stop arguing... State-created danger was argued in the appeal brief. That's correct. But the top wasn't. And they had a month to do it. No, the appeal brief was filed long after December 2005 when TAC was ratified. Wasn't the BIA hearing on January of 2006? The BIA decision? No. When was the BIA hearing? Did they argue before the BIA? No, there was no hearing before the board. When was the brief filed? Because it was December 3, as I understand, despite... TAC went into effect on December 3. It wasn't September 20 or August 29 or whatever. Because I think it had to go through a process of being approved by us. Mr. Ranchi's brief was filed on January 25, 2006. Okay, so that was a month and a half, over a month and a half after TAC... After the ratification. The United States signed the treaty 5 years before that. Or 3 years before that. Yes, sometime before that. Suppose you could have filed another motion to reopen for an effect of 6 as a council in the brief before the BIA. But that didn't happen, right? No, that has not happened. And you say that there's no... We have no jurisdiction to take judicial notice of TAC? I mean, I can't see that taking judicial notice is a jurisdictional issue. Exhaustion is jurisdictional, Your Honor, and the record before you is jurisdictional. Yeah, well, exhaustion may be, which may mean that we have to remand so that that issue can be exhausted. But you have no jurisdiction if it hasn't been exhausted. I can't imagine the executive telling the judiciary that it can't take judicial notice of that which the legislature and the executive have approved. I just... I find that... That is not the process. The process is the alien. When a change takes place, the alien makes a motion to reopen. That creates a record. That creates a decision. That creates something that's judicially reviewable on appeal. I suppose your argument is we can take judicial notice of it, but it doesn't get us anywhere. That's correct. It has no relevance to this case whatsoever. Under your view of the case. You're arguing this for this record. That's correct. But let me take a moment and say our look at this treaty is absolutely upside down. I heard the other side, I'm not sure which attorney argued, that the treaty is aimed at preventing harm to witnesses. Wrong. Wrong, wrong, wrong. This treaty is aimed at prosecuting transnational crime. It's aimed at making it possible to prosecute transnational crime. What does Article 34 say? Article 34 says each state party shall take appropriate measures within its means to provide effective protection for potential retaliation or intimidation for witnesses in criminal proceedings. In order to prosecute transnational crime, we have to protect witnesses. Everybody's going to recognize that. We're going to protect the witnesses only for ourselves. As to what the overall intention was, if they have a sub-intention to protect witnesses in order to fulfill the other intention, what difference does it make? The protection of witnesses is no different in this context than it is in any other context, and that's what Congress and the President said in the ratification and the signing statements. Our law already does that. What this treaty does is it says we're going to pay attention to what Albanians' obligations are under the treaty as well. The convention itself and the protocol that's attached says we are going to send home as soon as possible all migrants who come to us. Mr. Ranchi is a migrant. We're supposed to send him back to Albania. My question to you is maybe a little more basic. The U.S. Department of Justice has a letter in the appendix here that says this is to confirm that Mr. Ranchi was a material witness in this case. Yes. He was paroled in the United States as a material witness while the case was pending. It was claimed he was not promised that he would be given permanent admission in exchange for his cooperation. However, Mr. Ranchi and other material witnesses' cooperation was an important factor in convincing the defendant to plead guilty. Yes. Move on. Exactly the facts of the Morgan case that was just cited to you where relief was denied. My question to you then was what can you do to take appropriate measures to be sure that this person isn't killed if he goes back to Albania? Well, there's a series of things. First of all, you were told that the facts are not in dispute. Clearly the facts are in dispute because we're disputing whether or not any promise was made. Clearly we're disputing the extent of the danger. So let me do that. Accept that. This person was an important factor. Your words, your own government's words, that he was an important factor in getting a conviction here. Correct. And Article 24 says you need to take appropriate measures to protect witnesses in those types of circumstances. Correct. What measures are you taking? We gave him voluntary departure and allowed him to go somewhere other than Albania. But now you're saying that there ain't no way he can get voluntary departure. At this point, having abandoned that right, it's all on him. He abandoned the right to take voluntary departure. He abandoned the ability to go somewhere else. Let me add another thing. There are other statutes that are involved in this discussion of what the statutory body is that's sufficient in U.S. law according to the ratification of the signing statement. For instance, in Section 101A.15 of the Immigration and Nationality Act, 1101A.15, subsections S, T, and U That's the S visas. are provisions for S visas, T visas, and U visas. S visas being what people call them since visas that are designed for cooperating witnesses. But Congress specifically limited it to certain kinds of cases where the cooperation is so critical that we choose to give this person a visa to stay in the United States. Isn't there some humanitarian provision that nobody's citing to us? I thought there was. Somebody mentioned to me that there's some provision in the law that involves... I'm not aware of any independent humanitarian right. There's a humanitarian provision under the T visa where it talks about if you're sick, I think it is, or if T is trafficking victims, U is crime victims. Theoretically, he could fit under any of these categories, but unfortunately, he doesn't fit under the category of serious trafficking, which is the limitation for the T visas, and he doesn't fit in as an abused victim of crime under the U visas. So Congress has specifically considered under what circumstances the status as a witness or victim or whatever you want to call it associated with crime is going to rate not being from the United States and said these are them, he's not. Are you suggesting that this is what the executive had in mind when the president issued the signing statement? The total body of law... Honestly, I think the president and Congress had in mind the obligation to enact criminal statutes to enforce the treaty, which is the whole point of the treaty. The collateral provisions about protecting witnesses, they are collateral, they're really collateral, but at the same time, the same statement applies. Our provisions for protecting witnesses and victims already exist in U.S. law, and to the extent that they exist, that is the extent to which they exist. Many courts have addressed the issue of whether a cooperating witness gets some sort of constitutional right out of this cooperation, and every single one has denied it. Don't you think, though, that the BIA should consider this treaty? If this had been made on the original case, if he had taken his asylum claim, his withholding claim, and his cat claim, and particularly his Convention Against Torture claim, you can argue that the Convention Against Torture occupies more space than this theoretical right under the treaty. It's not theoretical. It's an actual right. I mean, it says it. There's nothing theoretical about it. The concept that this applies to wipe out other laws that Congress has already said are sufficient is crazy. There's nothing here that says that this applies to immigration decision. There's nothing here that says that somebody will have a right to be somewhere or is entitled to witness protection. We take steps to protect witnesses, and we've done that. Let me add one more thing. Go ahead. Why don't you add, and then I'll come back to my question. The reason that cat doesn't work is the same reason that the treaty doesn't work and the same reason that state-created danger doesn't work. There's an intervening sovereign. Who is responsible for the protection of this Albanian citizen? It's Albania. Our job is to send him back to Albania. The responsibility of Albania is to protect its own citizen under general... Is Albania his signatory? It is. In fact, it was an original signatory, and it enacted it right away. Albania's obligation is to protect this witness under this provision, and they may wish to prosecute transactional crime in their own country using his testimony as well. That's our obligation under the treaty, is to send him back to Albania, let Albania protect him, let Albania prosecute transnational crime under him. And ignore the fact that on the record it shows that he's gotten some death threats. He got one death threat in 2003, none after that time, and he faces the same danger here as he does anywhere else. There's no evidence that he faces additional danger in Albania than he does in the United States. It is a transnational organized crime organization. Is there any evidence that you have that he was part of the smuggling ring, or was he just one who was trying to get here? None whatsoever, except being a solicitor. He was complicit in the smuggling to the extent that he sought them out, paid them, and came to the United States. That's everybody who comes. That's correct. All these millions of people that are out there. That's correct. Claiming some sort of benefit from getting caught and cooperating against the people who smuggle makes it anybody who comes can then say, Can I cooperate? I volunteer to cooperate. And by the way, tell the guy that smuggled me so I can stay in the United States. If Albania was not a signatory to the convention, would you think that you have taken appropriate measures by having the person sent back to that particular country? Under the protocol itself, it obligates us to send them back. That's what the protocol says we're supposed to do with migrants. We're supposed to send them back to their home country. So under the convention, I would say we're doing what the convention says, and the convention is clearly not talking about not sending somebody back to their home country. But you understand what our concern is? I understand. That we may be, if we go your way, sending a person back to be killed in certain circumstances. In every asylum case where asylum is argued, that is normally the situation as the Supreme Court has deterred. Okay. All right. Thank you very much. We'll hear the rebuttal, and we'll keep you this time to your time because we're way over time. Mr. Chen. Thank you. Then I will be brief. I will be quick about this. I really want, first of all, to correct two things that I believe oil counsel just said. The first is about intimidation that happened outside the courtroom. Oil counsel said that the immigration judge supposedly in denying the motion to reopen said he had given certain warnings. That's actually not in the record. The immigration judge's decision said none of these allegations are material in any way, which is a very surprising statement by the IJ. He also said that the BIA appropriately looked at those factors and the standards. But actually, if you take a look at the BIA decision, that's not what they did at all. All they said was you failed to inform the prior counsel of the allegations, which I think is a completely un- Well, that's not true. They talked about they had a phone call, and there was an affidavit of it, and it doesn't establish the prior counsel was aware of the allegations and that it presented no evidence that it was given the opportunity to respond. And I think that's not a supportable or defensible comment because we included the affidavit that included prior counsel's responses to our allegations. So, of course, he heard the allegations. How could we give the IJ his rebuttal if we didn't tell him what the allegations were? So they certainly had no comment on the issue of the bar complaint. So oil counsel's suggestion that the BIA dealt with all the issues, I think, is not supported by the BIA and IJ's decisions. Another comment I'd like to make is that- the question of ineffective assistance of counsel. The government sent out a letter in April 2005 saying he was an important factor. The hearing was, what, August 8th? Roughly, yes. And so he was asked a series of questions as to whether he indeed was acting voluntarily. He then claims a few months later that, in fact, he was not acting voluntarily despite what he said at that hearing.  The record is not clear on what the judge asked him at the time that he appeared to accept voluntary departure. We don't know what the judge asked him. It's not in the record? It's not in the record. They did not transcribe what happened. There's an opportunity for any side to get it transcribed. Oil didn't ask it to be transcribed or ICE counsel didn't. Is it recorded? It should be recorded. It should be recorded. What are the odds? I think it depends on the proof of what happened outside the courtroom. I think that's a factual question. Someone could be severely intimidated outside a courtroom and then come in and say things. This is maybe a difficult factual question, but it is a factual question, not an irrelevant issue. Finally, the suggestion that all we need to do is send people back to Albania regardless of if they'll be killed there, it certainly is not the point of the TOC. They would perhaps need to negotiate with Albania to work together to return migrants to their countries, but there's nothing that says they can just throw them off the plane. But it's not Albania that's killing him. There's nothing in the record to show that he will be tortured or killed by the government. There's some criminal who's out to get him. If the TOC says work together to return someone and make sure crime witnesses in these types of situations are protected, then Albania needs to work on both. Work with the U.S. to take him back and work to protect him as opposed to simply ignore the protection and let's throw him off the plane over Albania and wash our hands and hope Albania protects him. Thank you very much. Thank you all. Thank you for coming. We will take a five-minute recess.